## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

GLORIA PALMIERI,                          :
          Plaintiff                  :
                                     :
      v.                              :              3:08-cv-292 (CFD)
                                       :
                                     :
GEORGE KAMMERER AND JOSEPH               :
MURGO,                                    :
          Defendants                 :

## RULING ON MOTION FOR SUMMARY JUDGMENT

The plaintiff, Gloria Palmieri, brought this action against the defendants, police officers George Kammerer and Joseph Murgo, alleging constitutional violations pursuant to 42 U.S.C. § 1983.  Palmieri alleges that the defendants violated her Fourth Amendment rights by conducting a warrantless search of her home, seizing her lawfully possessed handgun, and obtaining a search warrant by making false representations to the issuing judge.  Defendants move for summary judgment on all claims.  For the reasons that follow, the defendants' motion for summary judgment is granted in part and denied in part.

## I.    Background[1]

Plaintiff is Gloria Palmieri, a 76-year-old woman who has lived in East Haven, Connecticut since 1973.  She is single, unemployed, and, due to a physical disability, she uses a motorized wheelchair.  Defendants Kammerer and Murgo are police officers in the East Haven Police Department.

---

[1]The following facts are taken from the parties' Local Rule 56(a) statements, summary judgment briefs, and other evidence submitted by the parties.  They are undisputed unless otherwise indicated.

-1-

On July 20, 2007, Judy Petrillo, an employee of United Illuminating (an electric company), went to Palmieri's home at Palmieri's request to discuss her outdoor lighting situation.  Palmieri claims that she contacted Petrillo to obtain her assistance in having a streetlight turned to better illuminate her property.  Palmieri claims she needed more security after her house was allegedly burglarized.  Petrillo informed Palmieri that the streetlight belonged to the city and that Palmieri would have to contact the city to see about adjusting the light.  Palmieri then invited Petrillo into her house to see the damage from the alleged burglary.

Petrillo claims that while inside Palmieri's house, Petrillo saw a gun on Palmieri's kitchen table, although she could not tell if it was an actual gun or a BB gun.  Palmieri asserts, however, that she never mentioned the gun or pointed into the kitchen at the gun as Petrillo claims.  In her deposition Palmieri admits she told Petrillo that she was not able to eat or sleep, but claims that she does not "sleep anyway because of [her] injuries."  On Monday, July 23, 2007, Petrillo called the East Haven Police Department to see if they could do anything for Palmieri's safety.  Petrillo also called the police because she felt disturbed by the way Palmieri acted and by the gun on the table.  The police report filed by Kammerer indicates that Petrillo told the police that Palmieri appeared distraught and was paranoid, and that Palmieri indicated to Petrillo that she had a gun which she kept in the kitchen for her protection.  In response to Petrillo's complaint, Officers Kammerer and Murgo went to Palimieri's house.

According to Palmieri's deposition, the officers banged on her front door and never answered when she asked who it was.  She further claims that she only opened the door when she saw through the window that it was two police officers.  When she answered the door, Kammerer and Murgo informed her that Petrillo had filed a complaint regarding a gun.  Although Palmieri's

Local Rule 56(a) statement denies that she invited the officers in and claims that the officers demanded to come in, her deposition testimony indicates otherwise:

> "Q. Did you let [Officer Murgo] into the living room?  A. Yes, I invited both of them.  Q. So you invited them into the living room area?  A.  Yeah, but I didn't tell Sergeant Kammerer to go in my kitchen. He went in and walked right by me."

The front door of Palmieri's house opens up into the living room.  The living room leads into the kitchen, which is approximately twenty-five feet down the hall.  While Palmieri was talking to Murgo in the living room, with her back turned away from the kitchen, Kammerer walked passed her into the kitchen and picked up her gun.[2]  Palmieri denies that Kammerer saw the gun before he walked into the kitchen.

Kammerer then unloaded the bullets from the gun.  In reaction to Kammerer unloading the weapon, Palmieri turned around and stated "What are you doing?", "You got no business taking that gun apart," "I have a permit to carry that gun and permit to fire it,"[3] and that she

---

[2] Palmieri's Rule 56(a) statement declares that "[d]uring their first, warrantless, visit to the plaintiff's home . . . [the defendants] walked through her living room, kitchen and bedroom areas, conducting a visual search."  Palmieri's deposition, however, discusses Kammerer walking through the living room into the kitchen and "taking the gun apart" at the kitchen table; she does not mention her bedroom.

[3] The record is unclear on whether Kammerer and Murgo knew Palmieri had a permit when they entered her house.  Petrillo did inform the police that Palmieri had a gun, and the defendants' warrant application noted Palmieri's pistol permit number.  It is unclear, however, at what time they obtained this permit information.  To obtain a pistol permit in Connecticut, an individual must file an application for a temporary state permit with the local chief of police. Conn. Gen. Stat. § 29-28(b) (2009).  Upon approval of this temporary permit, the chief of police forwards the application to the commissioner of public safety who may then issue the state permit.  See id.  If the commissioner issues the state permit, the commissioner then forwards a record of the permit to the authority who issued the temporary permit.  See id.  Therefore, the East Haven Police Department likely had a record of Palmieri's permit, but it is unclear whether Kammerer or Murgo knew of the permit before they entered Palmieri's house.

would need her nephew to put the gun back together.[4]  Palmieri claims that although the gun was loaded, the "lock" was on.  Palmieri told the officers that she would shoot anyone who breaks through the front door who does not belong in her house, and that she carries the gun from room to room with her for protection.  She admitted that she did so because she lives alone and does not "know what's waiting for [her] at the end of that hallway" because the hallway is "pitch dark."

Kammerer and Murgo claim that based on Palmieri's statements, the way she was acting, and finding a loaded handgun on her kitchen table, they believed that she posed a threat to herself and others.  After leaving Palmieri's house, the officers applied for and obtained a search and seizure warrant from the Connecticut Superior Court.  In the affidavit for the search warrant the officers stated that Palmieri was ready to fire her gun "at anyone who walked through the front door."  However, on the cover page of the warrant application, the officers stated that Palmieri said "she would shoot anyone that breaks into her front door. This comment was made in reference to a burglary."  The warrant affidavit also referenced the contents of Petrillo's phone call to the police.

After the warrant was issued by the Superior Court, Kammerer and Murgo returned to Palmieri's house.  Palmieri invited them in.  Palmieri claims that Kammerer and Murgo did not tell her that they had a search warrant until after they entered her home.  Kammerer and Murgo then confiscated two guns from Palmieri, as well as her pistol permit.  After seizing those items, Kammerer and Murgo left Palmieri's house.

---

[4]  Palmieri stated in her deposition that by "taking the gun apart" she meant that Kammerer took the bullets out of the gun.

On August 27, 2007, following a hearing, the Connecticut Superior Court ordered that Palmieri's firearms be returned.  The Court also found that Palmieri did not threaten to shoot anyone who entered her house, but only said she would shoot any person who illegally broke into the house.  Palmieri took possession of the firearms again in September 2007.

Palmieri asserts that she has never been arrested and has "never consulted with or been treated by any person in connection with any type of mental, psychological or emotional issue."

Palmieri claims in this action that the defendants violated her Fourth Amendment rights by entering her home without a warrant, walking through her home into the kitchen area, seizing her handgun from the kitchen table, and unloading it.  She further claims that the defendants violated her constitutional rights by making materially false representations in their search warrant affidavit.

The defendants move for summary judgment claiming they were invited into Palmieri's home, saw the gun in plain sight, and did not "seize" the gun, only unloaded it.  Additionally, defendants argue that they had reasonable grounds to apply for a search warrant and did not misrepresent any material facts to the Connecticut Superior Court.  Finally, the defendants argue that they are entitled to qualified immunity as a matter of law.

## II.  <u>Discussion</u>

A.  <u>Summary Judgment Standard</u>

In a summary judgment motion, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  <u>See</u> Fed. R. Civ. P. 56; <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).  A court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); accord Miner v. Glens Falls, 999 F.2d 655, 661 (2d Cir. 1993). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

When examining a motion for summary judgment the Court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. Patterson v. County of Oneida, NY, 375 F.3d 206, 218 (2d Cir. 2004). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party on the issue on which summary judgment is sought, summary judgment is improper. Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004). However, a party may not create a genuine issue of material fact by resting on the "mere allegations or denials" contained in his pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995).

B.      The First Search—Were the Officers Lawfully Present in the Kitchen?

i.      *Consent to the Search*

A search conducted without a warrant is per se unreasonable unless one of the settled exceptions to the warrant requirement, such as consent, applies. Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). Consent can be both express or implied by actions or conduct. See United States v. Deutsch, 987 F.2d 878, 883 (2d Cir. 1993). The scope of an individual's consent under the Fourth Amendment is a question of fact. United States v. Gandia, 424 F.3d 255, 265 (2d Cir. 2005). The standard for measuring that scope is objective reasonableness, namely, what would a "reasonable person have understood by the exchange between the officer and the suspect?"

<u>Florida v. Jimeno</u>, 500 U.S. 248, 251 (1991).

In <u>United States v. Gandia</u>, the defendant in a subsequent criminal prosecution consented to allowing police officers to enter his apartment—particularly the kitchen— to continue a discussion the defendant was having with the officers outside in the rain.  See <u>Gandia</u>, 424 F.3d at 258.  The police officers never explicitly asked permission to search the apartment, and the defendant never explicitly told the police officers they could search the apartment.  <u>Id.</u> at 265. While the defendant was carrying on a discussion with one of the officers in the kitchen, another officer entered the doorway between the kitchen and living room and saw a bullet in the living room.  See <u>id.</u> at 259.  Although the defendant testified that he did not notice that the officers had entered the living room until after the police officer found the bullet, <u>see id.</u> at 265, on remand from the Second Circuit the district court found that the defendant had given implied consent to the officers to enter the doorway.  See <u>United States v. Gandia</u>, 276 F. App'x 10, 12 (2d Cir. 2008).

The undisputed facts here are somewhat similar to those presented to the Second Circuit prior to remand to the District Court in <u>Gandia</u>.  Palmieri invited Officers Kammerer and Murgo into her living room.  Palmieri claims that she did not notice Kammerer then enter the kitchen because she was speaking with Murgo.  Only after she heard Kammerer empty her gun did she confront him.  Palmieri maintains that although she never asked the officers to leave, she never told them they could enter the kitchen part of her home.  Because the scope of consent is a factual question and on summary judgment the Court must consider the facts in the light most favorable to the plaintiff, the defendants cannot obtain summary judgment on the ground that Palmieri consented to Kammerer's entry in the kitchen.  Additionally, the defendants have offered no

evidence that Palmieri impliedly consented to their entering the kitchen other than her invitation to enter the living room.  See, e.g., United States v. Romy, No. 96-CR-607 (JG), 1997 WL 1048901 (E.D.N.Y. Apr. 24, 1997).  Thus, summary judgment for the defendants on the ground that Palmieri expressly or impliedly consented to the entry into her living room is not warranted.

ii.      Plain View

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant."  Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971) (plurality opinion).  However, whether the officers were able to see the gun in plain view and therefore had grounds to enter the kitchen and seize it is a disputed issue of material fact.  According to Palmieri, the officers were standing in the living room approximately twenty-five feet away from the kitchen where the gun lay on the kitchen table.  Palmieri claims that Kammerer simply passed by her into the living room and disputes that Kammerer could see the gun from where he stood in the living room.  Therefore, summary judgment for the defendants is not granted on this ground.

iii.     Protective Sweep/Search of Grab Area

Under Maryland v. Buie, 494 U.S. 325 (1990), as an incident to arrest, police officers may search a dwelling without a warrant, looking in places where a person might be hiding and from which an attack may be launched.  Id. at 334.  To conduct this "protective sweep" the officers must have a reasonable suspicion based on specific articulable facts that the house is harboring a person posing a danger to the officers.  United States v. Gandia, 424 F.3d 255, 264 (2d Cir. 2005) (citing Buie, 494 U.S. at 336).  Although the person posing a danger does not have to actually be hiding in the house, see United States v. Miller, 430 F.3d 93 (2d Cir. 2005) (upholding a protective sweep where officer followed defendant into his bedroom based on a

reasonable suspicion that defendant might use unsupervised time in the bedroom to obtain a weapon), the purpose of the protective sweep cannot simply be to enter areas inaccessible to the suspect to "ferret[] out secreted firearms." Id. at 101; see also United States v. Waldner, 425 F.3d 514, 517 (8th Cir. 2005) (noting that protective sweep exceeded lawful scope when officer went into an adjoining room five to ten feet away from the defendant—that the defendant had not entered—because the officer believed that defendant might enter that room to retrieve a firearm).

In Miller, the Second Circuit extended Buie protective sweeps to situations where officers are lawfully present in an individual's home other than for the execution of an arrest warrant. Miller, 430 F.3d at 98–99 (holding that police officer "present in a home under lawful process. . . may conduct a protective sweep"); cf. United States v. Ali, No. 05-CR-785(NG)(SMG), 2006 WL 929368, at *6 (E.D.N.Y. Apr. 7, 2006) (interpreting Miller as not resolving whether protective sweeps following consent entry are reasonable and constitutional). Regardless of whether Miller expanded protective sweeps to situations of consent entry, the evidence here—considered in the light most favorable to the plaintiff—does not show that the protective sweep doctrine applies in this case. The facts presented do not demonstrate that Officers Kammerer and Murgo had a reasonable suspicion that a "person posing danger" to the officers was in the kitchen. Like in Waldner, Palmieri was approximately twenty-five feet away from the kitchen when Kammerer went in, and she did not attempt to enter that room. Additionally, the facts do not indicate that the police had any reason to believe that anyone other than Palmieri was present in the home. Therefore, because the undisputed facts presented do not demonstrate that the officers had reason to believe a dangerous person was in the kitchen, summary judgment cannot be granted in favor of the defendants on the basis of the protective sweep doctrine.

-9-

The search and entry into the kitchen is also not justified on the basis of a search of Palmieri's "grab area."  In Gandia, the Second Circuit noted that the Buie protective sweep differs from a warrantless search of an arrestee's "grab area."  Gandia, 424 F.3d at 261.  Namely, a Buie protective sweep focuses on the safety threat posed by potential unseen third parties in the house, while a "grab area" search under Chimel v. California, 395 U.S. 752 (1969), focuses on the threat posed by the arrestee.  Gandia, 424 F.3d at 261.  A person's "grab area" is the area "within his immediate control"—namely, "the area from within which he might gain possession of a weapon or destructible evidence."  Id.  In assessing what areas would be in an individual's "immediate control," the Court should consider the individual's location and any "restraints" placed on the individual's person.  United States v. Blue, 78 F.3d 56, 60 (2d Cir. 1996).

In Gandia, the Second Circuit found that the search of the adjoining room was not within Gandia's "grab area."  See Gandia, 424 F.3d at 264.  Additionally, that Palmieri was 76-years-old and in a motorized wheelchair was a limit on her ability to reach her gun in the adjoining room. Therefore, because the facts taken in the light most favorable to the plaintiff do not show that the gun was within Palmieri's "immediate control," the search of the kitchen cannot be justified under the "grab area" of Chimel and summary judgment for the defendants on this ground is also inappropriate.

iv.	*Exigent Circumstances*

Police officers may enter a dwelling without a warrant to render "assistance to a person whom they reasonably believe to be in distress."  Kerman v. City of New York, 261 F.3d 229, 235 (2d Cir. 2001) (internal citations omitted) (discussing distress where police entered the

dwelling of plaintiff in response to an anonymous 911 call which declared that "a mentally ill man . . . was off his medication and acting crazy and possibly had a gun"). Courts must apply an objective standard to determine the reasonableness of the officer's belief. Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998).[5]

"The essential question in determining whether exigent circumstances justified a warrantless entry is whether law enforcement agents were confronted by an 'urgent need' to render aid or take action." United States v. Guadalupe, 363 F. Supp. 2d 79, 82 (D.Conn. 2004) (quoting United States v. MacDonald, 916 F.2d 766, 769 (2d Cir. 1990)). For example, police may enter a home "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (reasonable belief that exigent circumstances existed when while responding to a noise complaint the officers heard a loud altercation from inside the house and yelling). The police officer, however, "bear[s] a heavy burden when attempting to demonstrate an urgent need." Welsh v. Wisconsin, 466 U.S. 740, 749–50 (1984).

The decisions holding that exigent circumstances existed had situations much more dire than the one that confronted the officers here. See, e.g., Deloreto v. Karengekis, 104 F. App'x 765 (2d Cir. 2004) (exigent circumstances when police knew the individual had mental problems

---

[5] In Anderson v. Creighton, the Supreme Court noted that although it is clearly established that, absent exigent circumstances or probable cause, warrantless searches of an individual's home are illegal, in the qualified immunity inquiry the Court should examine whether it "was objectively legally reasonable to conclude that a given search was supported by . . . exigent circumstances [based on an] examination of the information possessed by the searching officials." 483 U.S. 635, 641 (1987). The test for whether qualified immunity attaches is the same as whether the officer was objectively reasonable in his actions, Harhay v. Town of Ellington Bd. of Educ., 323 F.3d 206, 211 (2d Cir. 2003); therefore, the analysis is essentially identical and will be conducted together here.

and had been the subject of an emergency psychiatric evaluation, weapons were involved, the individual's parents were the victims and possibly hostages, and the individual stated he wished to kill the Wethersfield police); *Anthony v. City of New York*, 339 F.3d 129 (2d Cir. 2003) (exigent circumstances when a 911 call from inside the house indicated that an armed man was committing a violent crime against the caller); *Ostroski v. Town of Southold*, 443 F. Supp. 2d 325 (E.D.N.Y. 2006) (exigent circumstances existed for police to search and seize firearm when police responded to 911 call about a domestic disturbance between two siblings who were allegedly going to retrieve weapons located on the premises).  Here, no harm to Palmieri was imminent or urgent in the sense that something dangerous was happening at the time the officers arrived at her home.  Although the police did have information from Petrillo that Palmieri had a gun and was acting "paranoid," this evidence is not sufficient to meet the "heavy burden" of justifying a warrantless entry on summary judgment under the exigent circumstances exception.

Moreover, even if exigent circumstances existed to allow the defendants to enter the house, the issue is whether the officers reasonably believed exigent circumstances existed to permit them to enter the kitchen.  In *Koch v. Town of Brattleboro*, 287 F.3d 162 (2d Cir. 2002), the Second Circuit held that the police officers were lawfully invited into the house by an individual whom the officers reasonably believed was the plaintiff's companion.  The plaintiff was suffering from bipolar disorder and had attempted to prevent two individuals from leaving a parking lot by blocking their car and then threatening them physically and verbally.  See *id.* at 164.  After the police lawfully gained entry to his house, the plaintiff demanded that they leave and then abruptly entered his bedroom with his companion.  *Id.* at 164–65.  The Second Circuit held that because of the plaintiff's propensity for erratic behavior and his abrupt disappearance,

the officers reasonably believed that exigent circumstances justified their entry into the bedroom to render emergency aid or assistance to a person they believed to be in distress.  See id. at 169.

Here, the officers were invited into Palmieri's living room.  Therefore, their initial entry into the house is justified based on consent.  However, even if the officers based their initial entry on rendering emergency assistance to Palmieri, the facts taken in the light most favorable to the plaintiff do not demonstrate that exigent circumstances existed for them to enter the kitchen.  The facts do not indicate that Palmieri moved to leave the living room or enter the kitchen at any time.  Therefore, any potential emergency situation or aid that Palmieri might have required could have been addressed in the living room.  Aside from seeing the gun in plain view (which is a disputed issue of material fact), the facts do not demonstrate that the officers had reason to believe that anything in the kitchen required their immediate attention or assistance.  Therefore, because a reasonable jury could conclude that no exigent circumstances existed justifying a warrantless entry and warrantless search of the kitchen, summary judgment should be denied.  See Abdella v. O'Toole, 343 F. Supp. 2d 129, 139 (D.Conn. 2004) (holding that summary judgment is denied because a reasonable jury could easily conclude that no exigent circumstances existed to justify a warrantless search of the home).

Material issues of fact prevent the Court from granting summary judgment for the defendants on the ground of an applicable exception to the warrant requirement.  Therefore, the Court must analyze whether summary judgment is appropriate on qualified immunity grounds.

C.    Qualified Immunity

Government officials performing discretionary functions are entitled to qualified immunity if their conduct does not violate clearly established statutory or constitutional rights that a

reasonable person would have known about.  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).

Qualified immunity applies if the official's mistake is a mistake of law, mistake of fact, or mistake

based on mixed questions of law and fact.  Pearson v. Callahan, 129 S. Ct. 808, 815 (2009).  The

purpose of qualified immunity is to protect officials when they must make difficult "on-the-job"

decisions.  Zieper v. Metzinger, 474 F.3d 60, 71 (2d Cir. 2007).  Thus, qualified immunity

protects "all but the plainly incompetent or those who knowingly violate the law" by giving

"ample room for mistaken judgments."  Id. (quoting Hunter v. Bryant, 502 U.S. 224, 229 (1991)).

 In Pearson, the Court modified its holding in Saucier v. Katz, 533 U.S. 194 (2001).  In

Saucier, the Court held that a court must first decide whether there is a violation of the plaintiff's

constitutional rights, and only after satisfying that first step must the court decide whether the

right at issue was clearly established at the time of the alleged misconduct.  See generally Saucier.

Pearson made it discretionary which prong of the test a court should address first in light of the

facts of the particular case at hand.  See Pearson, 129 S. Ct. at 818.

 In the Second Circuit, qualified immunity analysis consists of a three-step inquiry

examining whether there is an alleged violation of a constitutional right, whether the right was

clearly established at the time of the conduct, and—if the right was clearly established—whether

the defendants' actions were objectively reasonable.  Harhay v. Town of Ellington Bd. of Educ.,

323 F.3d 206, 211 (2d Cir. 2003).  Summary judgment on qualified immunity grounds is

inappropriate if there are disputed facts that are material to determining reasonableness.

Yorzinski v. Alves, 477 F. Supp. 2d 461, 469 (D.Conn. 2007) (citing Thomas v. Roach, 165 F.3d

137, 143 (2d Cir. 1999)).  However, if the material facts are undisputed, "[t]he objective

reasonableness test is met . . . if officers of reasonable competence could disagree on the legality

-14-

of defendant's actions, taking into account the facts and circumstances of each particular case . . .

and acknowledging that police officers are often forced to make split-second judgments—in

circumstances that are tense, uncertain and rapidly evolving."  Id. at 470 (internal quotations

omitted).

To be "clearly established," the contours of a right must have been sufficiently clear so

that a reasonable official would understand that what he is doing violates that right—unlawfulness

must be apparent.  Anderson v. Creighton, 483 U.S. 635, 640 (1987).

> In determining whether a particular right was clearly established at the time
> defendants acted, [the Second Circuit] has considered three factors: (1) whether the
> right in question was defined with 'reasonable specificity;' (2) whether the
> decisional law of the Supreme Court and the applicable circuit court support the
> existence of the right in question; and (3) whether under preexisting law a
> reasonable defendant official would have understood that his or her acts were
> unlawful.

Yorzinski, 477 F. Supp. 2d at 469–70 (internal citation omitted).  "Only Supreme Court and

Second Circuit precedent existing at the time of the alleged violation is relevant in deciding

whether a right is clearly established."  Moore v. Vega, 371 F.3d 110, 114 (2d Cir. 2004).

i.    *Consent to the Search*

The right that needs to be "clearly established" here is whether an individual who invites

the police officers to enter a portion of her home has the right to be free from searches in

adjoining rooms absent her consent.

"It is by now well established that while a warrantless search of a home is generally

unreasonable and therefore violates the Fourth Amendment, . . . an individual may consent to a

search, thereby rendering it reasonable."  United States v. Garcia, 56 F.3d 418, 422 (2d Cir. 1995).

An individual, however, may limit the scope of the search to which she consents.  Florida v.

-15-

Jimeno, 500 U.S. 248, 252 (1991).  Indeed, the scope of the consent is limited by its terms,

Walter v. United States, 447 U.S. 649, 656 (1980), and an invitation to enter a house does not

authorize an officer to conduct a general search for incriminating materials.  See Lewis v. United

States, 385 U.S. 206, 211 (1966) (noting that although a government agent may obtain an

invitation to enter a home, here characterized as a place of business, to conduct a illegal narcotics

transaction, this invitation does not give the agent carte blanche to search); see also United States

v. Gandia, 424 F.3d 255 (2d Cir. 2005) (although Gandia had consented to the officers entering

his apartment, the Second Circuit remanded for determination of whether Gandia had impliedly

consented to allowing police officers to enter adjacent room).  Therefore, it was clearly

established at the time of the officers' conduct in this case that they needed to obtain both consent

to enter and consent to search the dwelling, and that consent to enter does not automatically imply

the ability to also conduct a search.

Therefore, the question arises whether a reasonable officer would have known that he did

not have consent to enter the kitchen and that entering the kitchen without consent was unlawful.

See Moore, 371 F.3d at 115.  Other than the invitation to enter the dwelling, the defendants have

presented no undisputed evidence that would permit a reasonable officer to infer that he had

express or implied consent to enter the kitchen.  Although the officers informed Palmieri that they

had come to her home because they had received a complaint about a gun, the defendants have

presented no evidence that they indicated they wanted to see or examine the gun in any way.

There is also no evidence that Palmieri gestured toward where the gun was located or invited them

into the kitchen verbally or otherwise, and Palmieri maintains she did not give such permission.

Therefore, the defendants have not provided sufficient evidence to show that a reasonable officer

-16-

would think that he had implied consent to enter the kitchen to look for the gun. Thus, summary judgment based on qualified immunity is denied on this basis.

*ii.*     *Protective Sweep/Grab Area*

There is no doubt that the law regarding protective sweeps was "clearly established" under Maryland v. Buie, 494 U.S. 324 (1990), and United States v. Miller, 430 F.3d 93 (2d Cir. 2005), at the time of the officers' conduct in this case. Therefore, the question for qualified immunity purposes is whether the defendants reasonably believed there was a person posing a danger in the kitchen. The defendants do not argue that such a person was in the kitchen or that they had any reason to believe anyone other than Palmieri was at home. Additionally, Defendants do not argue that they followed Palmieri into the kitchen in the belief she would obtain her firearm therein. Therefore, because the defendants have not provided sufficient evidence demonstrating that an objectively reasonable officer would have conducted a protective sweep, qualified immunity is not available on this basis.

With regard to a "grab area" search, the question is whether it was clearly established that an item located in an adjacent room is outside an individual's "grab area." In Chimel v. California, 395 U.S. 752 (1969), the Supreme Court held that an officer may search the area into which an arrestee might reach to grab a weapon. Chimel, 395 U.S. at 763. In Gandia, the Second Circuit held that the defendant did not have "ready access" to the adjoining room, and therefore the search of the adjoining room was not part of the defendant's "grab area." Gandia, 424 F.3d at 264. Therefore, Palmieri's right not to have the adjacent room searched under the auspices of a Chimel "grab area" search was clearly established at the time of the search here.

The officers do not specifically allege that they conducted a "grab area" search.

-17-

Additionally, the facts taken in the light most favorable to the plaintiff demonstrate that it is not objectively reasonable for the officers to believe that the gun, which was in a different room approximately twenty-five feet away from a 76-year-old woman in a wheelchair, was in that person's immediate control. Therefore, it would not be objectively reasonable for the defendants to justify their search under the "grab area" doctrine, and the defendants are not entitled to qualified immunity on these grounds.

*iii.*     *Plain View*

As noted above, summary judgment on qualified immunity grounds is inappropriate if there are disputed facts that are material to determining reasonableness. Yorzinski, 477 F. Supp. 2d at 469 (citing Thomas v. Roach, 165 F.3d 137, 143 (2d Cir. 1999)). Material issues of fact remain about whether Kammerer could see the gun in plain view from the living room. Therefore, summary judgment based on qualified immunity is inappropriate on this basis.

*iv.*     *Conclusion*

Because genuine issue of material fact exist regarding whether any exceptions to the warrant requirement apply, and because the evidence presented does not demonstrate that the defendants are entitled to qualified immunity on this claim, Defendants' motion for summary judgment on Palmieri's illegal search and seizure claim is denied.[6]

D.     Was the Search Warrant Obtained by Misrepresentation of Material Facts?

Palmieri claims that by stating in the search warrant affidavit that she would fire her gun "at anyone who walked through the front door," Kammerer and Murgo materially misled the

---

[6] The Court does not decide whether Officer Kammerer's unloading of Palmieri's gun constituted an unlawful seizure in violation of the Fourth Amendment.

issuing judge.  She further claims that if the issuing judge had been informed of her actual

statement, the judge would not have issued the search warrant because there would not have been

probable cause.

A plaintiff suing under § 1983 and challenging a warrant on the basis of misrepresentation

of material facts

> must make the same showing that is required at a suppression hearing under Franks
> v. Delaware: the plaintiff must show that the affiant knowingly and deliberately, or
> with a reckless disregard of the truth, made false statements or material omissions in
> his application for a warrant, and that such statements or omissions were necessary
> to the finding of probable cause.

Velardi v. Walsh, 40 F.3d 569, 573 (2d Cir. 1994) (internal citations omitted).  To demonstrate

that an officer acted with reckless disregard in making the statement, the plaintiff must show that

the officer in fact entertained serious doubts as to the truth of the statement.  See United States v.

Markey, 131 F. Supp. 2d 316, 324 (D.Conn. 2001); see also United States v. Kunen, 323 F. Supp.

2d 390, 395 (E.D.N.Y. 2004) (adopting the same subjective test for reckless disregard and citing

cases from the First, Sixth, Seventh, and Eighth Circuits in support).  "Allegations of negligence

or innocent mistake are insufficient."  Franks v. Delaware, 438 U.S. 154, 171 (1978).  The fact

finder "may infer reckless disregard from circumstances evincing obvious reasons to doubt the

veracity of the allegations."  Markey, 131 F. Supp. 2d at 324 (internal quotations omitted).

It should be noted that "every statement in a warrant affidavit does not have to be true."

United States v. Stone, No. 3:05cr281 (EBB), 2007 WL 2727532, at *7 (D.Conn. Sept. 18, 2007)

(quoting United States v. Canfield, 212 F.3d 713, 717 (2d Cir. 2000)).  However, if the warrant

affidavit contained deliberately or recklessly false information, then the Court should review the

"corrected affidavit" de novo to determine if probable cause exists.  Canfield, 212 F.3d at 718;

Velardi, 40 F.3d at 573 (noting that a "corrected affidavit" is one in which the Court has crossed out any allegedly false information and supplied any omitted fact).  Probable cause is "a practical, commonsense decision" based on all of the circumstances set forth in the affidavit.  Canfield, 212 F.3d at 718.  The probable cause standard is akin to "a fair probability."  See id.  "The ultimate inquiry is whether, after putting aside erroneous information and material omissions, 'there remains a residue of independent and lawful information sufficient to support probable cause.'" Id. (internal citations omitted); see also United States v. Martin, 426 F.3d 68, 73 (2d Cir. 2005) (noting that if the allegedly false statement is necessary to the magistrate's finding of probable cause, then the false statement is material).

In the context of qualified immunity, the determination of whether the information is relevant to probable cause is a question of law; however, the weight that a "neutral magistrate" would likely have given the information is an issue for the finder of fact, and so summary judgment is inappropriate in doubtful cases.  Velardi, 40 F.3d at 574.  Nonetheless, if the evidence viewed in the light most favorable to the plaintiff demonstrates that there is no genuine dispute that a judge would have issued the warrant based on the "corrected affidavits," then a qualified immunity defense must be upheld.  Id.

Under Conn. Gen. Stat. § 29-38c(a), police may obtain a search warrant enabling them to seize any and all firearms in the search location if two police officers affirm under oath that they have probable cause to believe that "(1) a person poses a risk of imminent personal injury to himself or herself or to other individuals, (2) such person possesses one or more firearms, and (3)

such firearm or firearms are within or upon any place, thing or person."[7]  In determining whether there is probable cause to believe the grounds for the warrant application exist, the judge considers recent threats or acts of violence by the individual directed toward other persons or herself.  See id. § 29-38c(b).  In analyzing whether such recent threats constitute probable cause, the judge may consider other factors, including but not limited to the reckless use or display of a firearm, history of use, attempted use or threatened use of physical force by the individual, prior involuntary confinement in a psychiatric hospital, and the use of controlled substances by the person.  See id.

Palmieri claims that Kammerer and Murgo materially misled the issuing judge by declaring that Palmieri had informed them that she was "ready to fire at anyone who walked through the front door."  The warrant affidavit does make that assertion.  The cover page of the warrant application, however, notes that Palmieri informed the defendants that "she would shoot anyone that breaks into her front door.  This comment was made in reference to a burglary."  It is undisputed that Palmieri's statement to the defendants was "that she would shoot anyone who breaks through the front door who doesn't belong in her house."  Although the statement on the warrant application cover page is not verbatim what the plaintiff had stated, it conveys the same meaning.

The misstatement in the warrant affidavit does not rise to the level of reckless disregard for the truth.  Particularly when analyzed in conjunction with the statement on the warrant application cover page, which accurately conveyed Palmieri's meaning, the evidence does not

---

[7] Of course, these statutory factors, as applied to the particular circumstance, must also meet the constitutional requirements.

demonstrate that Kammerer or Murgo "entertained serious doubts as to the truth of [their] statement." See Markey, 131 F. Supp. 2d at 324; see also Escalera v. Lunn, 361 F.3d 737, 744 (2d Cir. 2004) (noting that "although the district court characterized Lunn's application for a warrant as having been 'made to appear' that Lunn was an eyewitness," another copy of the application stated that the allegations were based on police investigation and supporting depositions); United States v. Goncalves, No. 5:07-CR-257 (NAM), 2008 WL 2080550 (N.D.N.Y. May 15, 2008) (Court did not find reckless disregard where sworn statement by one officer misquoted a statement by a complainant, but complainant's statement was accurately recounted in another officer's affidavit and in complainant's statement attached to the warrant application). At most, the defendants' misstatement is negligent paraphrasing. Therefore, summary judgment is granted for the defendants on Palmieri's claim that the officers obtained the search warrant by misrepresentation.

Even if the officers' misstatement could be considered deliberately or recklessly made, summary judgment for the defendants on this claim is still appropriate because the issuing judge would have found probable cause to issue the warrant based on the "corrected affidavit." Palmieri claims that had the judge been informed of her correct statement the judge would not had issued the search warrant. The application for the search warrant, however, contained more than the claimed misstatement discussed above. The affidavit also mentioned Petrillo's phone call to the police department, Petrillo's apparent observation of the gun, and Petrillo's impression of Palmieri as appearing unstable, distraught, and paranoid. Furthermore, the affidavit contained the officers' observation of the gun on Palmieri's table, as well as Palmieri's apparent anger after Kammerer unloaded the gun and Palmieri's statement that she would need her nephew to come

"put the gun back together."  Based on these assertions, this situation is not a "doubtful" case.  De

novo review of the "corrected affidavit" shows that probable cause existed to find that Palmieri

posed a "risk of imminent personal injury to herself or to other individuals."  Therefore, summary

judgment for the defendants on Palmieri's claim that the search warrant lacks a legal basis is

appropriate on these grounds.[8]

## III.     Conclusion

        Accordingly, the defendants motion for summary judgment [Dkt # 20] is GRANTED IN

PART and DENIED IN PART.

        SO ORDERED this   27th   day of January 2010, at Hartford, Connecticut.




                                 /s/ Christopher F. Droney
                                **CHRISTOPHER F. DRONEY**
                                **UNITED STATES DISTRICT JUDGE**

---

        [8] That Palmieri had her guns returned to her does not mean that the police officers lacked
probable cause to obtain the warrant.  At the hearing to determine whether the seized firearms
should be returned to the owner, the State must prove by clear and convincing evidence that the
person poses a risk of imminent personal injury to herself to prevent the firearms from being
returned.  Conn. Gen. Stat. § 29-38c(d).  The "clear and convincing" standard of proof is more
difficult to meet than the standard of probable cause; therefore, the fact that the guns were
eventually returned to Palmieri is not dispositive here.  See In re John Doe, Inc., 13 F.3d 633, 637
(2d Cir. 1994) (noting that "clear and convincing evidence" is a higher standard than "probable
cause").