IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

---------------------------------------------x
GLORIA PALMIERI                :
                               :           3:08 CV 292 (JGM)
V.                             :
                               :
GEORGE KAMMERER AND            :           DATE: FEBRUARY 24, 2011
JOSEPH MURGO                   :
---------------------------------------------x

MEMORANDUM OF DECISION

Plaintiff, Gloria Palmieri, commenced this action on February 26, 2008 against defendants East Haven police officers, George Kammerer and Joseph Murgo, alleging that defendants violated her Fourth Amendment rights by conducting a warrantless search of her home, taking apart a legal handgun that she had in her kitchen, and later in the same day, after obtaining a search and seizure warrant, seizing her firearms and firearms permit. (Dkt. #1). On April 15, 2008, defendants filed their answer and affirmative defenses. (Dkt. #10). On January 27, 2010, United States District Judge Christopher F. Droney granted summary judgment in defendants' favor on the search and seizure of plaintiff's firearms and firearms permit during their second visit to plaintiff's residence, which search and seizure was made pursuant to a valid warrant; summary judgment, however, was denied as to defendants' search and disabling of plaintiff's firearm during their first visit to plaintiff's residence. Palmieri v. Kammerer, 690 F. Supp. 2d 34, 41-51 (D. Conn. 2010).[1] (See also Dkt. #27).

On May 8, 2010, the parties consented to trial before this Magistrate Judge (Dkts. ##39-41), and on November 15, 2010, a bench trial was held at which plaintiff, defendant Kammerer, defendant Murgo, Jay Falcioni, a retired Lieutenant of the East Haven Police

---

[1]With respect to the first search, Judge Droney held that there were factual issues that precluded summary judgment regarding express or implied consent, plain view, protective sweep/search of grab area, and exigent circumstances, as well as qualified immunity. Id. at 41-48. See Section II & note 18 infra.

Department, and Judith Petrillo, a independent witness, testified. (Dkt. ##54-56).[2]

For the reasons set forth below, judgment shall enter in favor of <u>defendants Kammerer and Murgo.</u>

## I. FACTUAL FINDINGS

The following constitutes the Court's findings of fact pursuant to FED. R. CIV. P. 52(a)(1):

Plaintiff, a seventy-seven year old resident of East Haven, Connecticut, is disabled and uses a motorized scooter for transportation. (Tr. 3-4). Defendants Kammerer and Murgo are police officers employed by the East Haven Police Department. (Tr. 95, 115-16).

On Friday, July 20, 2007, Judy Petrillo, a long-time employee of the United Illuminating Company (Tr. 19-20), went to plaintiff's home, at plaintiff's request, to discuss her outdoor lighting (Tr. 20-21), as, according to plaintiff, she had been burglarized around 1:00 a.m. on the morning of July 4, 2007.[3] (Tr. 18, 51). Petrillo testified that she was invited into plaintiff's home and plaintiff took her on a "tour," including a tour of her bedroom, to show Petrillo where she said she had been burglarized. (Tr. 22).

---

[2] During a pre-trial conference held telephonically before this Magistrate Judge on November 5, 2010, counsel agreed that in light of Judge Droney's ruling, the evidence in this case was limited to events that occurred prior to the defendant officers leaving plaintiff's house around 11:30 a.m. (Dkts. ##50-51). Subsequent to this conference, the parties also agreed to a bench trial in lieu of a jury trial.

Defendant offered three exhibits: the East Haven Police Department Call Summary Report, dated July 23, 2007 (Exh. 1) and East Haven Police Department Case/Incident Report, dated July 23, 2007 (Exh. 3), both of which were admitted in full. Handwritten notes authored by Judith Petrillo were marked for identification purposes only (Exh. 2). (Dkt. #54).

[3] The East Haven Police Department responded to plaintiff's burglary complaint on July 4, but the police officers determined that plaintiff's complaint was unfounded. Plaintiff disputes their conclusion and contends that the police did not conduct an investigation; she claims she still has fingerprints on her window that was dented by the burglars. (Tr. 51-52; <u>see</u> Tr. 16-18, 53-54).

2

According to Petrillo, there is a wall separating plaintiff's living room from her kitchen, but there was a walkway from the living room into the kitchen; from the living room, Petrillo could see a wall of glass in the rear of the house, and from the front door, she could see the contents of the kitchen. (Tr. 21). However, Petrillo also testified that when she was in the house, the kitchen was dark and when she looked in, she could "just see the glass on the outside window." (Tr. 30). Petrillo testified that when she was in plaintiff's living room, about ten feet from the front door, standing next to plaintiff, plaintiff pointed to her kitchen table, and as plaintiff told Petrillo that she keeps guns in the house, Petrillo looked toward the table. (Tr. 23-24, 31, 34). According to Petrillo, plaintiff pointed to the gun and said that she keeps it on the kitchen table all the time for protection. (Tr. 21-22, 23-24, 31, 33). While she was standing ten feet from the front door, Petrillo could see the gun but she could not determine whether it was a real gun or a pellet gun, and she did not enter the kitchen. (Tr. 24, 31).[4] Petrillo estimated that she was in plaintiff's home for about forty-five minutes, of which she spent about thirty minutes in plaintiff's living room. (Tr. 29-30).

Plaintiff, in contrast, testified that Petrillo "was nowhere near my living room" when plaintiff pointed to the table; according to plaintiff, Petrillo was "near the front door." (Tr. 58-59). Plaintiff acknowledged, however, that "[y]ou can see the contents of my kitchen from the front door[,]" although plaintiff disputed that from her front door, "you could see a gun." (Tr. 10, 47). Plaintiff testified that her toaster oven obscured anyone's ability to see the gun on her kitchen table and she further denied telling "anything" to Petrillo, claiming that Petrillo "made up those stories herself." (Tr. 56, 60, 70).

---

[4]At her deposition, plaintiff testified that she "never told [Petrillo] I had a gun. It was right on the table. If she could see, she could see it, but it was facing the wall." (Plaintiff's Depo. at 51; see Tr. 69-70). However, at trial, plaintiff did not remember saying this. (Tr. 70).

3

Petrillo described plaintiff, as she appeared on July 20, 2007, as "very afraid and distraught" over having been robbed more than two weeks earlier. (Tr. 22, 24). Petrillo testified that plaintiff fears for her life, she lives all alone and no longer has any pets, so that she stays up all night in the back of her house with a gun. (Tr. 15, 23).[5] Petrillo tried to speak with plaintiff about "perhaps looking into elderly housing options so she would not be so fearful." (Id.). When Petrillo left the home, she felt compelled to contact the Town of East Haven, to look for an ombudsman to assist plaintiff in moving; on Monday July 23, 2007, Petrillo called the East Haven Police Department because she was concerned that a child would run through plaintiff's back yard and plaintiff would shoot him out of fear. (Tr. 24-25, 26). Petrillo spoke with (then) Lt. Jay Falcioni[6] and advised him she had visited plaintiff's home on Friday and that plaintiff had a weapon; Petrillo said that she did not know if it was a gun or a pellet gun, but plaintiff was very distraught and feared being robbed so Petrillo was worried that a child would walk through the lawn and be shot by mistake. (Tr. 24-25, 26). In his testimony, Falcioni confirmed that Petrillo had conveyed that plaintiff was acting paranoid -- she was afraid of being robbed and she was distraught. (Tr. 39). Petrillo relayed that plaintiff had a handgun on her kitchen table that she would use for protection, and Petrillo felt that plaintiff was a danger to herself and to other people because Petrillo was concerned that the handgun would be used against an innocent person. (Tr. 26; see Tr. 40).

Upon receipt of the telephone complaint, Falcioni generated a case number and entered the information into a Call Summary Report. (Tr. 40; see Exh. 1). The Call

---

[5] Plaintiff similarly testified that "if they break in again, the ones that robbed me, I'll be waiting for them. Yeah. Yeah. Yeah." (Tr. 68).

[6] Falcioni retired from his position as a Lieutenant in the East Haven Police Department in February 2010. (Tr. 38).

Summary Report entry at 11:49 a.m. reads:

> UI employee Judy Petrillo reports speaking to Gloria Palmieri at her residence Friday evening, at which time Palmieri was distraught, paranoid and unstable. Furthermore, Petrillo states Palmieri made a comment about having a gun, at which time Petrillo observed on the kitchen table what appeared to be a dark colored handgun.

(Exh. 1; see also Tr. 42). At 11:51 a.m., the following entry was added: "Computer shows Palmieri has a permit (#197234) and a Beretta 21A, 22 cal (ser. #DAA332544) registered to her." (Exh. 1; see also Tr. 43).

Defendant Kammerer, a twenty-four-year veteran of the East Haven Police Department, with a ranking of Sergeant, testified that Falcioni informed him that there was a complaint from a UI worker, Petrillo, who was at plaintiff's house on Friday and who described plaintiff as paranoid; Petrillo stated that she saw a gun on plaintiff's kitchen table and was told by plaintiff that she keeps the gun for protection and walks around with it from room to room. (Tr. 95-96, 100-01). Defendants Kammerer and Murgo were dispatched to plaintiff's house.[7] (Tr. 100-01). According to defendant Kammerer, he and defendant Murgo

---

[7]The Case/Incident Report completed by Sgt. Kammerer reads in part:

Judy [Petrillo] advised Lt. Falcioni that Gloria told her she keeps a gun for protection and pointed to a handgun laying on the kitchen table not far from where Judy was standing. The fact that there was a gun laying out in the open made Judy nervous and afraid for her safety. After Judy left the residence she called the police and left a voice message for Chief Gallo . . . whom she knows. The message was forwarded to Lt. Falcioni who then contacted Judy. Judy stated that Gloria appeared distraught and was paranoid. Judy felt that Gloria may be a danger to herself or others. Myself [sic] and Officer Murgo the[n] went to the residence to evaluate Gloria[']s state of mind. Upon entering the residence[,] I noticed a 22 cal[iber] semi auto[matic] handgun laying on the kitchen table. I then picked the gun up and secure[d] it for officers['] safety. At this time[,] I found the gun loaded with one round in the chamber. Gloria became irate and began yelling that I had no right to touch the firearm. I explained that for officers['] safety I only wanted to make the weapon safe until we finished talking. Gloria again yelled that I had no right to touch her weapon and again I explained that I was only removing the magazine and the round from the chamber. Gloria then stated that she would need her nephew to put the gun back together

5

were told that Petrillo feared for plaintiff's safety and the safety of others, and defendants should check on plaintiff's "mental well-being." (Tr. 100; see also Tr. 117-18). When they arrived at plaintiff's home, they knocked several times. (Tr. 101, 119; see Tr. 5, 54-55). Plaintiff testified that she asked four times who was there before the officers responded, "East Haven Police." (Tr. 5, 49, 55). Defendant Kammerer knew upon arrival that there was a gun inside. (Tr. 101). Plaintiff let defendants into her house and did not place any restrictions on their movement; plaintiff testified that at the time, she was using forearm crutches,[8] but neither defendant could recall if she had crutches. (Tr. 55-56, 64, 71-72, 102, 119-20, 123).

Defendants Kammerer and Murgo[9] described plaintiff's home as a raised ranch with a garage underneath. (Tr. 99; see Tr. 87, 118-19). When they walked in the front entrance, they were in the living room, and beyond that was the kitchen. (Tr. 99; see Tr. 119). To the left of the house was a hallway with two bedrooms, one on the left and one on the right. (Id.). This testimony is consistent with plaintiff's description of her home -- when one enters the doorway, one enters the living room and there is an archway in the living room where the living room and kitchen meet. (Tr. 6, 8, 89-90). On the left side is a long hallway to the bedrooms, and the kitchen "is right where the living room is," that is, directly behind the

---

> (although it wasn't apart). When Gloria was asked why she needed a gun[,] Gloria stated that she would shoot anyone who breaks into her front door and that she carried the gun from room to room in her home for protection.

(Exh. 3).

[8]Plaintiff testified that she needs the assistance of crutches or a motorized scooter because her "hip is gone." (Tr. 4).

[9]Defendant Murgo testified that he had been to plaintiff's house once before this incident (Tr. 117-18), although plaintiff did not recognize him. (Tr. 49-50).

6

living room is the kitchen.[10]  (Tr. 6-8; see Tr. 90-91).  Plaintiff testified that it is approximately twenty feet from the front door of her house to her kitchen.  (Tr. 6, 8, 70).

Upon entry, defendant Kammerer told plaintiff that they received a complaint from Petrillo, and according to defendant Kammerer, plaintiff became upset "and started yelling . . . ."  (Tr. 103; see Tr. 120).  Defendant Murgo continued speaking with plaintiff, trying to explain that they were at her home in response to Petrillo's complaint, and while he was talking to plaintiff, defendant Kammerer looked over his shoulder, and "just as [Petrillo] described, there was a gun laying on [plaintiff's] kitchen table."  (Tr. 103, 113, 120).  Plaintiff testified that the table on which the gun was located is "[r]ight there as you come in from the living room," and there is no divider or anything else that separates the kitchen area from the living room.  (Tr. 11-12).[11]  Defendant Kammerer testified that he was standing in the middle of the living room when he saw the gun – it was in plain view.  (Tr. 103).  Defendant Murgo also testified that he could see the gun from the living room; the kitchen table was "clearly visible" from where they were standing. (Tr. 120-21).  Consistent with plaintiff's testimony, defendant Murgo testified that the kitchen table was about twenty feet from the front door.  (Tr. 121; see Tr. 8).

Plaintiff claims that the gun was "facing the wall" (Tr. 11, 56), and while her back was turned, defendant Kammerer "walked directly to the kitchen" and "took [her] gun apart on [her] kitchen table."  (Tr. 9, 11-12, 13, 14).  According to defendant Kammerer, for "officer

---

[10] Plaintiff did not offer into evidence any photographs or floor plans of the interior of her residence.

[11] When asked about her testimony on direct examination that the gun was on the kitchen table on July 20, 2007 because plaintiff forgot to put it in her box that morning, and it was again on the table on July 23, 2007, plaintiff responded, "I don't remember saying that . . . . I had a heart attack last month.  I don't remember."  (Tr. 57-58; see Tr. 17, 59-60, 82).

7

safety[,]" he picked up the gun, which was a Beretta 22 caliber semi-automatic weapon, dropped the clip and took out the round of bullets and placed all these items back on the table.[12] (Tr. 103-04). Defendant Kammerer further testified that this gun, as he found it, was ready to be fired, that is, if a person picked it up, he or she could pull the trigger and fire off rounds. (Tr. 105). Plaintiff acknowledged that when she testified that defendant Kammerer "took the gun apart," she meant that he took the ammunition out of the gun. (Tr. 9, 12-14; see Tr. 62-64). Plaintiff was yelling at defendant Kammerer that he should not take the gun apart, while Kammerer explained that he needed to do this for the officers' safety.[13] (Tr. 103-04; see Tr. 12-13). According to defendant Murgo, they were in a "pretty small area . . . so [he did not] think [they] all ended up all in that kitchen. [Defendant Murgo] may have stood right outside the kitchen as [plaintiff] focused her attention on [defendant] Kammerer about taking her gun apart." (Tr. 121). Defendant Murgo described plaintiff as "extremely agitated," and she "appeared paranoid that . . . the second we left she was in harm's way of some sort." (Tr. 122). Defendant Murgo estimated that they were in plaintiff's home for approximately twenty-five minutes (id.), and plaintiff similarly estimated they were there for a half hour. (Tr. 15).

After Petrillo made her complaint to the East Haven Police Department, plaintiff left her several voice mail messages telling Petrillo that she left her unarmed and if anyone broke into her home like the Cheshire home invasion (which, ironically, also occurred on July 23,

---

[12]Kammerer's job includes seizing guns on protective orders. (Tr. 104-05). Plaintiff was yelling at Kammerer for disabling the gun, but he testified that all he did was remove the ammunition and plaintiff should have some basic knowledge of loading a firearm, which Kammerer described as "Firearms 101." (Tr. 105).

[13]For the first time in the course of this litigation, plaintiff also claimed that Kammerer "put his hands on [her]," and had she not been using her crutches, she would have fallen. (Tr. 64). Murgo testified that defendant Kammerer was not abusive nor did he push plaintiff. (Tr. 122-23).

8

2007), it would be Petrillo's fault. (Tr. 26-27). Plaintiff testified that she has a permit to own and carry a gun but she has never used a gun and she never carries it with her. (Tr. 16-17, 59). She claims that she forgot "again" to put the gun in a safety box during the day on Friday, July 20, 2007 when Petrillo came in her home, and again on Monday, July 23, 2007, when the officers came to her home. (Tr. 10, 17, 56-57, 59-60).[14] According to plaintiff, she takes the gun out at night to use as protection "in case [the burglars] come back." (Tr. 17; see also Tr. 23).[15]

While plaintiff initially testified that she was "very defenseless" and "had no protection whatsoever []" after defendant Kammerer removed her ammunition (Tr. 15, 18),[16] she admitted that she was not in fact left defenseless that morning. (See Tr. 66-67). She owns a second gun that was in the home at that time, though plaintiff testified that she was told never to use that gun because it backfires. (See Tr. 64-65, 67). Plaintiff testified that she was "very upset" by defendants' actions as the police are supposed to protect her and she did not feel protected. (Tr. 73, 75-76). Plaintiff, however, was not inhibited from contacting police after this incident. (See Tr. 76-77). On February 27, 2008, plaintiff contacted the East Haven Police to complain about a tractor that was stolen from her by her niece a year earlier, and on May 6, 2010, plaintiff called the police after the man next door threw chlorine and her dog was inhaling it and later died.[17] (Tr. 79-80, 82-83).

---

[14] See note 11 supra.

[15] See note 5 supra.

[16] Plaintiff claims she was not able to reload the gun; she needed her nephew to "put the gun back together." (Tr. 65, 105, 122). However, plaintiff testified that she was able to put the bullets back in the gun by herself. (Tr. 65). See note 12 supra.

[17] Plaintiff had told Petrillo in July 2007 that she had no animals, because they had all died. (See Tr. 23).

9

II. CONCLUSIONS OF LAW

The following constitutes the Court's conclusions of law pursuant to FED. R. CIV. P. 52(a)(1):

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. CONST. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exception[s]," such as the plain view exception. Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).[18] "The burden is on those seeking an exemption from the requirement [of search warrants] to show the need for it." Chimel v. California, 395 U.S. 752, 762 (1969)(citations & internal alterations omitted); see also Florida v. White, 526 U.S. 559, 569 (1999).

"It is well established that under certain circumstances the police may seize evidence in plain view without a warrant." Coolidge v. New Hampshire, 403 U.S. 443, 465 (1971). "What the 'plain view' cases have in common is that the police officer in each of them had a prior justification for an intrusion in the course of which he came inadvertently across a

---

[18] In his Ruling on Motion for Summary Judgment, Judge Droney denied defendants' motion on the basis of the protective sweep on grounds that the undisputed facts did not demonstrate that the officers had reason to believe a dangerous person was in the kitchen; Judge Droney concluded that the facts did not show that the gun was in plaintiff's "immediate control," and thus a search of the kitchen could not be justified as within plaintiff's "grab area"; and defendants did not demonstrate that exigent circumstances existed for defendants to enter the kitchen. 690 F. Supp. 2d at 43-45. See note 1 supra.

There was no evidence at trial that a protective sweep/search of the grab area or exigent circumstances were issues in this case. (See also Dkt. #58, at 4-5).

piece of evidence incriminating the accused." Id. at 466. Thus, the issue at trial was whether the defendant officers were able to see the gun in plain view and therefore had grounds to enter plaintiff's kitchen and remove the ammunition from her firearm.

Defendant Kammerer testified that when he and defendant Murgo walked through the front door, they were standing in the living room, and after they explained to plaintiff why they were there, defendant Kammerer "looked over [his] shoulder, and just as [Petrillo] described, there was a handgun laying on the kitchen table." (Tr. 103). When asked if the gun was in plain view, defendant Kammerer responded, "Yes, it was." (Id.).

Defendant Murgo also testified that the gun was in plain view. (Tr. 120-21). According to defendant Murgo:

> A. As we were speaking with her in her living room, [defendant] Kammerer observed the handgun on the kitchen table. At that point, I was still speaking with [plaintiff] because she didn't understand why we were there.
>
> Q. Did you see the gun yourself?
>
> A. Yes.
>
> Q. And - - From where you were in the living room?
>
> A. Yes.
>
> Q. It was visible, clearly, to you?
>
> A. Yes, sir.
>
> . . .
>
> Q. Was the kitchen table clearly visible to you?
>
> A. Yes, it was.

(Tr. 120-21).

Plaintiff conceded that from the layout of her home, a person standing at the front

door of her home can see the kitchen and that her gun was left on her kitchen table. (Tr. 10, 47). Similarly, Petrillo, the third-party independent witness, testified that from plaintiff's living room, "[y]ou could see . . . [plaintiff's] kitchen table and then a wall of glass in the rear of the house." (Tr. 21). Petrillo testified that plaintiff pointed out the gun to her while they were "in the living room standing" next to each other (Tr. 34), and after plaintiff "pointed out to [Petrillo] that she kept a gun in the back of the house[,]" Petrillo looked and saw "something on the table." (Tr. 22; see Tr. 23-24, 30-31). According to Petrillo, while she could not determine whether it was a real gun or a pellet gun, she could see a gun on the table while she stood in the living room. (Tr. 24; see Tr. 31). Additionally, both sides agree that it is only about twenty feet from plaintiff's front door to her kitchen table and the defendants were standing inside her front door, in plaintiff's living room, less than twenty feet from the kitchen table when they saw the gun. (Tr. 6, 8, 70, 121). Further, plaintiff testified that the table on which the gun was located is "[r]ight there as you come in from the living room," and there is no divider or anything else that separates the kitchen area from the living room. (Tr. 11-12). Plaintiff does not dispute that she forgot "again" to put the gun in a safety box during the day on Friday, July 20, 2007, when Petrillo came in her home, and again on Monday, July 23, 2007, when the officers came to her home. (Tr. 10, 17, 56-57, 59-60).

The "extension of the original justification" for being in plaintiff's home after Petrillo expressed to the police her concern about plaintiff's actions, is "legitimate only where it is immediately apparent to the police that they have evidence before them." Coolidge, 403 U.S. at 466. Defendants have established that the gun was "immediately apparent." Id. All parties testified that the kitchen table is visible from the living room, and, as stated above, because Petrillo reported to the police that the gun was on the kitchen table, defendants

knew to look toward the kitchen table when they were standing in the living room upon their entry into plaintiff's home.

In light of the foregoing, defendants established their burden of proving by a preponderance of the evidence that the handgun was in their plain view and thus a valid exception to the warrant requirement is satisfied.

Additionally, although the inquiry ends and judgment enters in favor of defendants when they satisfied their burden of establishing that the gun was in plain view, plaintiff is not correct that defendant Kammerer had no right to "examine" plaintiff's gun. (See Dkt. #58, at 7). Upon dispatch to plaintiff's home, defendants were told by Falcioni that Petrillo reported that she was at plaintiff's house the Friday before and plaintiff "seemed paranoid[,]" and Petrillo was "in fear for the woman's safety or safety of other people," so that defendants were told that they "should go check on [plaintiff's] mental well-being." (Tr. 100-01; see also Exh. 3). Falcioni's and Petrillo's testimony was consistent with Kammerer's recollection and understanding of the situation. (See Tr. 21-26, 39-40 & Exh. 1). Defendants were also informed that "Petrillo . . . saw a gun on the kitchen table . . . [and] [s]he was told by [plaintiff] . . . that she keeps the gun here for protection, but walks around with the gun from room to room at night." (Tr. 100-01; see also Tr. 15, 17, 23). Plaintiff let defendants into her home and when defendants told her that they received a complaint from Petrillo, plaintiff "became upset and started yelling about why Judy called the police on her," after which defendant Kammerer looked toward the kitchen, where he was told by Falcioni that the gun was located, and he saw it "laying on the kitchen table." (Tr. 102-03). When defendant Kammerer found the gun, it was "ready to fire," that is, "[i]f you picked it up you could pull the trigger and let off rounds." (Tr. 105). In light of the circumstances, defendant Kammerer removed the ammunition for "[o]fficer safety." (Tr. 103-04; see also Exh. 3).

13

Accordingly, judgment shall enter in favor of defendants.[19]

### III. CONCLUSION

For the reasons stated above, <u>judgment shall enter in favor of defendants Kammerer and Murgo.</u>

SO ORDERED.

Dated at New Haven, Connecticut, this 24th day of February, 2011.

       /s/ Joan G. Margolis, USMJ
       Joan Glazer Margolis
       United States Magistrate Judge

---

[19]In light of this conclusion, the Court need not address the issue of implied consent. (<u>See</u> Dkt. #58, at 4).

In addition, Judge Droney questioned whether defendant Kammerer's unloading of plaintiff's gun "constituted an unlawful seizure in violation of the Fourth Amendment." 690 F. Supp. 2d at 48, n.6. Although plaintiff initially claimed that she was not able to reload the gun and she needed her nephew to "put the gun back together[,]" (Tr. 65, 105, 122), she also testified that she <u>was</u> able to put the bullets back in the gun by herself after defendants left her house. (Tr. 65). <u>See</u> notes 12 & 16 <u>supra</u>.